1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  VURNELL DOMINGO POLLARD,      ) Case No. CV 15-9487-JPR
                                  )
12                  Petitioner,   )
                                  )
13            v.                  ) MEMORANDUM DECISION AND ORDER
                                  ) DENYING PETITION FOR WRIT OF
                                  ) HABEAS CORPUS
14  RAYMOND MADDEN,               )
                                  )
15                  Respondent.   )
    _____)

16

17                         **PROCEEDINGS**

18       On December 8, 2015, Petitioner filed a Petition for Writ of

19  Habeas Corpus by a Person in State Custody and a separate

20  memorandum of points and authorities.  Petitioner consented to

21  having the assigned U.S. Magistrate Judge conduct all further

22  proceedings in his case, including entering final judgment.  On

23  April 26, 2016, Respondent filed an Answer and a memorandum of

24  points and authorities; he also consented to proceed before the

25  Magistrate Judge.  On July 5, 2016, Petitioner filed a Reply to

26  Respondent's Answer.

27       For the reasons discussed below, the Court denies the

28  Petition and dismisses this action with prejudice.

                                1

**BACKGROUND**

On September 8, 2011, Petitioner was held to answer in Los Angeles County Superior Court on charges that late on the night of January 30, he burglarized the home of Robert Guerrero in San Gabriel and, a little over an hour later, on the morning of January 31, used a gun to rob and burglarize Hung Tran at his home nearby. (See Lodged Doc. 1, Clerk's Tr. at 95-96.) Petitioner was also held to answer on charges of leading police on a high-speed chase as he fled Tran's home. (See id.)

An Amended Information was filed on October 6, 2011, alleging that Petitioner had used a firearm in connection with the robbery and burglary at Tran's home, had suffered one prior "strike" conviction within the meaning of California's Three Strikes Law, and was out on bail pending sentencing in another case when he allegedly committed the charged offenses. (See id. at 105-11.)  The Amended Information also alleged that some of the charges were serious, violent felonies. (See id. at 109.)

As discussed more fully below, on September 13, 2012, at a pretrial telephonic conference, the trial court briefly discussed the status of plea negotiations with Petitioner's counsel and the prosecutor, outside of Petitioner's presence. (See Lodged Doc. 2, 2 Rep.'s Tr. at 605, 608-10.)

The next day, the court and all parties, including Petitioner, discussed a plea bargain. (See id. at 901-22.)  They discussed the maximum sentence Petitioner might be exposed to if he was convicted on all charges, which would be as high as 34 years and four months. (See id. at 1212-13.)  Petitioner eventually accepted a plea deal, pleading no contest to the

2

robbery of Tran with the firearm allegation and the burglary of Guerrero's home and admitting his prior-strike conviction in exchange for a total sentence of 23 years and eight months, for both this case and the 2009 conviction for which he had been out on bail. (See id. at 1215-18; Lodged Doc. 1, Clerk's Tr. at 219-20; Lodged Doc. 3 at 2.)

On November 16, 2012, before sentencing, Petitioner moved under Faretta v. California, 422 U.S. 806 (1975), to represent himself, asking that his retained counsel be relieved. (See Lodged Doc. 2, 2 Rep.'s Tr. at 1803.) Petitioner also informed the court that he wished to file a motion to withdraw his plea. (See id. at 1806.) The court granted Petitioner's Faretta motion, finding that it was "knowingly, intelligently, voluntarily, and freely" made, and he began representing himself. (See id.) The court appointed an investigator and an audio/video expert to assist Petitioner with a planned challenge to the surveillance videos introduced at the preliminary hearing. (See id. at 1810-11, 2106.) The court continued the hearing to allow Petitioner more time to prepare his withdrawal motion. (Id. at 1808-09.)

On January 28, 2013, Petitioner filed his "Motion to Withdraw Plea." (Lodged Doc. 1, Clerk's Tr. at 157-66.) The motion arguably raised three claims: (1) the prosecution violated Brady v. Maryland, 373 U.S. 83 (1963), effectively rendering Petitioner's plea uninformed; (2) police officers used "coercive and abusive" investigative techniques that resulted in "false information"; and (3) former defense counsel was ineffective for failing to investigate exculpatory evidence in a timely manner,

3

which allegedly put Petitioner under "extreme duress" before he pleaded no contest.  (See Lodged Doc. 1, Clerk's Tr. at 157-66.) On February 15, 2013, Petitioner filed a supplement to his motion, in which he argued that ineffective assistance of counsel and an "illusory promise" — that is, that "personal" property seized from his car after his arrest would be returned to him — also contributed to coercing his plea.  (See id. at 167-77.)

On March 1, 2013, the trial court held a hearing and took the Motion to Withdraw Plea under submission.  (See Lodged Doc. 2, 2 Rep.'s Tr. at 2701-52.)  On April 2, 2013, the court issued a minute order discussing the procedural history of Petitioner's plea bargain and his efforts to withdraw his plea and requesting further briefing on sentencing issues. (See Lodged Doc. 1, Clerk's Tr. at 191-92.)  On April 10, 2013, Petitioner filed a second "Motion to Withdraw Guilty Plea."  (Id. at 196-204.)  On April 15, 2013, the trial court issued a tentative ruling denying Petitioner's motion and finding that he could properly be sentenced to the bargained-for 23 years and eight months.  (See id. at 213-14.)

Later that same day, the trial court held another hearing on Petitioner's motion and on probation and sentencing matters, including whether the court was "duty-bound" to sentence Petitioner "to a consecutive sentence."  (See Lodged Doc. 2, 2 Rep.'s Tr. at 3301-24.)  The court eventually stated, "I am now going to deny your motion to withdraw for the reasons stated in the . . . Minute Order that I filed today."  (Id. at 3318.)  The court then sentenced Petitioner to 23 years and eight months. (See id. at 3321-22.)

4

1    On April 29, 2013, the court held an evidentiary hearing on
2    Petitioner's motion for the return of his "personal" property and
3    took the matter under submission.  (See id. at 3601, 3639; see
4    also Lodged Doc. 1, Clerk's Tr. at 225-27.)  It eventually
5    granted the motion as to some items and denied it as to others.
6    (Lodged Doc. 1, Clerk's Tr. at 221-22.)

7    On May 3, 2013, Petitioner filed an application for a
8    Certificate of Probable Cause, seeking permission to challenge
9    his guilty plea on appeal.  (See Pet. at 24.)[1]  On May 23, 2013,
10   the trial court denied the application in a reasoned, eight-page
11   order.  (See id. at 24-31.)  On June 7, 2013, Petitioner filed a
12   notice of appeal, expressly acknowledging that he would only
13   challenge "other matters . . . that do not affect validity of the
14   plea."  (Lodged Doc. 1, Clerk's Tr. at 228.)

15   On October 8, 2013, Petitioner's appellate counsel filed a
16   brief under People v. Wende, 25 Cal. 3d 436 (1979), raising no
17   issues but asking the court to conduct an independent review of
18   the record on appeal.  (See Lodged Doc. 3 at 8.)  On November 13,
19   2013, Petitioner filed a supplemental brief in the court of
20   appeal, arguing that (1) the trial court erroneously denied him a
21   continuance at an unspecified time, (2) the trial court erred in
22   considering whether his sentence in the unrelated case should run
23   concurrently or consecutively, and (3) he should be allowed to
24   withdraw his guilty plea because of counsel's ineffective
25   assistance.  (See Lodged Doc. 4.)

26   _____

27       [1] For all filed as opposed to lodged documents, the Court
     uses the pagination provided by its Case Management/Electronic
28   Case Filing system.

1    On March 27, 2014, the court of appeal issued a reasoned,
2    four-page decision, noting in pertinent part that Petitioner had
3    not obtained a certificate of probable cause before filing his
4    appeal.  (See Lodged Doc. 5 at 3.)  Without one, he could not
5    challenge the validity of his plea or any related matters, such
6    as his sentence, the denial of his motion to withdraw the plea,
7    or his counsel's alleged ineffective assistance during the plea-
8    bargaining process.  (See id.)  The court of appeal went on to
9    state,

10        We have reviewed the whole record under People v. Kelly
11        (2006) 40 Cal. 4th 106.  No arguable issues for appeal
12        exist. . . .  The judgment is affirmed.
13   (Id. at 3-4.)

14        In the meantime, on November 18, 2013, Petitioner filed a
15   Petition for Writ of Mandate in the court of appeal, arguing that
16   "[t]he trial court erroneously denied the application for
17   certificate of probable cause."  (Lodged Doc. 8.)  On December
18   20, 2013, the court of appeal denied the petition on the ground
19   that Petitioner "has failed to state facts and evidence
20   sufficient to demonstrate entitlement to relief."  (Lodged Doc.
21   9.)

22        On May 9, 2014, Petitioner filed a petition for review in
23   the California Supreme Court, arguing that the trial court
24   wrongly denied an unspecified "continuance" and that that denial
25   violated Petitioner's right to effective assistance of counsel.
26   (See Lodged Doc. 6 at 5.)  On June 18, 2014, the supreme court
27   summarily denied the petition for review.  (Lodged Doc. 7.)
28        On October 31, 2014, Petitioner filed a Petition for Writ of

                                    6

1  Habeas Corpus in the California Court of Appeal.  (<u>See</u> Lodged

2  Doc. 10 at 6.)  That petition argued that (1) Petitioner's

3  appellate counsel was ineffective for filing a <u>Wende</u> brief; (2)

4  Petitioner's trial counsel was ineffective for "failure to

5  investigate," among other things, the surveillance video from the

6  Guerrero robbery, which Petitioner claimed showed a white or

7  Caucasian person; and (3) the trial judge improperly participated

8  in plea discussions.  (<u>See</u> Lodged Doc. 10.)  On November 20,

9  2014, the court of appeal denied the petition, stating that it

10  "has been read and considered and is denied on the ground

11  petitioner has not stated facts or provided evidence sufficient

12  to demonstrate entitlement to relief."  (Lodged Doc. 11.)

13      On January 20, 2015, Petitioner filed a habeas petition in

14  the California Supreme Court, raising the same three arguments he

15  had just raised in the court of appeal.  (Lodged Doc. 12.)  On

16  April 1, 2015, the supreme court denied the petition with

17  citations to <u>People v. Duvall</u>, 9 Cal. 4th 464, 474 (1995), and <u>In</u>

18  <u>re Swain</u>, 34 Cal. 2d 300, 304 (1949).[6]  (Lodged Doc. 13.)

19      On August 10, 2015, Petitioner filed another habeas petition

20  in the California Supreme Court.  (Lodged Doc. 14.)  That

21  petition argued that the "[t]rial judge improperly participated

22  in plea negotiations, violating Federal Rule of Criminal

23  Procedure rule 11(c)(1)," and "[t]rial counsel's failure to

24

_____

25      [6] Citations to <u>Swain</u> and <u>Duvall</u> indicate that the claims

26  were not alleged with sufficient particularity and that the
petitioner could attempt to raise them again.  <u>See</u> <u>King v. Roe</u>,

27  340 F.3d 821, 823 (9th Cir. 2003) (per curiam), <u>abrogation on</u>
<u>other grounds recognized by</u> <u>Waldrip v. Hall</u>, 548 F.3d 729 (9th

28  Cir. 2008).

investigate violated the right to effective assistance of counsel as guaranteed by the Sixth Amendment of the U.S. and California Constitutions." (See Lodged Doc. 14 at 3-4.) On November 10, 2015, the California Supreme Court denied the petition with a citation to In re Miller, 17 Cal. 2d 734, 735 (1941).[7] (Lodged Doc. 15.)

### PETITIONER'S CLAIMS

Construing the Petition liberally, the Court finds that it presents the following claims:

1. The trial court violated Petitioner's rights when it (1) improperly inserted itself into plea negotiations, in violation of Federal Rule of Criminal Procedure 11; (2) influenced or coerced Petitioner to accept a plea bargain, in particular by misrepresenting Petitioner's eligibility for a work program and what Petitioner's sentence would be, rendering his plea involuntary; and (3) refused to allow Petitioner to withdraw his plea.

2. Petitioner's counsel provided ineffective assistance by failing to investigate the surveillance video from the robbery at Guerrero's home, in particular by not hiring an expert to analyze whether the video showed Petitioner or another person, perhaps a

---

[7] Miller holds that a habeas claim in a previously denied petition must again be denied when there has been no change in the facts or law substantially affecting the petitioner's rights. See 17 Cal. 2d at 735. Thus, the California Supreme Court's citation of Miller indicated that its denial of Petitioner's claims rested on the same ground as its dismissal of the claims in Petitioner's first habeas petition, namely, failure to raise them with sufficient particularity. See King, 340 F.3d at 823; Kim v. Villalobos, 799 F.2d 1317, 1319 n.1 (9th Cir. 1986).

white Caucasian suspect, and by failing to adequately challenge the prosecution's DNA evidence linking Petitioner to the crimes.

**SUMMARY OF PERTINENT FACTS**

This Court's review of the state-court record reveals the following facts:

**I.   Preliminary-Hearing Record**

As noted, a preliminary hearing was held on September 8, 2011. (<u>See</u> Lodged Doc. 1, Clerk's Tr. at 1-B.)

A.   <u>Incident on January 30, 2011, at Guerrero's Home</u>

Guerrero testified that on the night of January 30, 2011, he was asleep in his house in San Gabriel when, around 11:53 p.m., he was awoken by noise in the back of his house. (Lodged Doc. 1, Clerk's Tr. at 5.) He went to the kitchen and saw someone on the other side of the sliding glass door, trying to enter the house; Guerrero flipped on a light and saw a man about two or three feet away from him. (<u>Id.</u> at 6-7.) Guerrero described the man as "husky," with a "big body build" and wearing a white-gray sweater and a black ski mask that covered his whole head. (<u>Id.</u> at 6-8.) Guerrero said the sliding glass door was locked and the man was trying to open it. (<u>Id.</u> at 8.) After he turned on the kitchen light, he ran up to the sliding door and banged on the glass, and that scared the man away. (<u>Id.</u> at 9.) Guerrero said the incident "happened really quick," in a matter of "just seconds." (<u>Id.</u> at 6, 9.)

Guerrero called the police. (<u>Id.</u> at 10.) Before they arrived, Guerrero noticed some damage to the sliding glass door and some "pry marks." (<u>Id.</u> at 11-12.) The kitchen had two windows. (<u>Id.</u> at 12-13.) Before the incident both windows had

9

screens over them, but afterward Guerrero noticed that one of the windows was missing a screen. (See id.) Guerrero found the missing screen right below the window; he noticed "pry marks" on it, too. (Id. at 13-14.)

Guerrero testified that he had operable surveillance cameras outside of his home the night of the incident. (Id. at 14.) The prosecutor stated that there were "four clips" from the surveillance cameras and played two of those clips at the preliminary hearing. (Id. at 14-16.) Guerrero confirmed that the two clips were taken from the surveillance cameras at his home on the night of the incident; both showed the suspect he saw outside the sliding glass door. (Id. at 16.) Guerrero stated that he had not been able to see the suspect's face because he was wearing the ski mask. (Id. at 17.)

B.   Incident on January 31, 2011, at Tran's Home

Tran also testified at the preliminary hearing. (See id. at 21.)  He testified that on January 31, 2011, he was sleeping in his house in San Gabriel when, at around 1:10 a.m., he woke to find someone wearing a black ski mask standing in his bedroom, holding a flashlight and pointing a gun in his face. (See id. at 21-23.)  Tran said the suspect was a man, "heavy-set," about "five-five, five-six." (Id. at 23.)  The man was wearing a white shirt or sweatshirt. (See id. at 24, 36-37.)  Tran said the suspect pointed the gun at his face from about a foot away. (Id. at 25.)

Tran testified that the suspect said that "somebody told him" Tran "got money in the house." (Id.)  Tran told the suspect that "I have no money in the house" but "what you want, you can

10

take it." (Id.)  Tran got his wallet, and he gave the suspect
what he thought were "two hundred-dollar bills and a couple
twenties and a couple five [sic] and ones," and the suspect put
the money in his pants pocket. (Id. at 26.)  The suspect also
took Tran's Rolex watch. (Id. at 26-27.)  Tran said the suspect
pointed the gun at him throughout the incident. (Id. at 28-29.)
After the suspect left, Tran called the police "right away."
(Id. at 29.)

Tran said he had working surveillance cameras at his house
that night. (Id.)  The prosecutor played one video clip from
Tran's surveillance cameras, and Tran said he recognized the
footage, which showed the side of Tran's house the night of the
incident. (Id. at 30-31.)  Tran confirmed that the video showed
the suspect in the ski mask. (Id.)  Tran said he saw only the
suspect's eyes because he was wearing the ski mask. (Id. at 31.)

C.   Other Testimony

San Gabriel Police Officer Nhat Huynh testified that he was
on duty on January 31, 2011, when, at about 1:10 a.m., he
received a radio call to respond to Tran's home about a robbery
home invasion. (Id. at 40-43.)  Because he was nearby, he got to
Tran's home in "literally less than 10 seconds." (Id. at 40.)
Upon his arrival, Officer Huynh saw a red Toyota Corolla speeding
away. (Id. at 41.)

Officer Huynh switched on his lights and sirens and pursued
the Toyota, but the vehicle "sped up even more" and ran a couple
of stop signs. (Id. at 42-44.)  Huynh pursued the vehicle over
surface streets, and during the pursuit he saw the driver throw
"a hat or beanie" out the car window. (Id. at 45.)  The vehicle

11

drove through a road-closure barricade, got on the freeway, and began traveling at speeds of "over 100 miles an hour." (Id. at 44-46.)  The vehicle eventually exited the freeway. (Id. at 46.) Officer Huynh said that as it did so, the suspect threw "numerous" other objects out of the car; at one point he "saw a white shirt being tossed out the window." (Id. at 47-48.) Officer Huynh testified that after a pursuit that "zigzagged" on surface streets "all over that portion of Los Angeles," the vehicle finally yielded, and the driver stepped out of the car. (Id. at 48-49.)  Officer Huynh identified Petitioner as the driver whom police apprehended at the scene. (Id. at 49.)

A subsequent search of the car recovered "numerous items," including "Chanel, Gucci, [and] Louis Vuitton purses." (Id.) Another officer searched Petitioner and recovered money that "was a mixture of hundreds, twenties, tens, and fives." (Id. at 50-51.)  Police also found a "black gun bag" in the car, but they did not recover a gun. (Id. at 51.)  On cross-examination, Officer Huynh testified that police reports did not reflect that police recovered a gun, a Rolex watch, or any gloves from the car. (Id. at 52-53.)

A criminalist from the Los Angeles County Sheriff's Crime Lab, Sean Yoshii, testified that he performed DNA testing on a black ski mask recovered following the vehicle pursuit and on an "oral reference sample" taken from Petitioner. (See id. at 57-62.)  Yoshii testified that "[t]he profile I obtained from the black ski mask is a mixture consistent with two contributors," and "[t]he profile and major contributor matches the profile of [Petitioner]." (Id. at 62-63.)  Yoshii testified that the odds

12

of finding another "African-American or black" person with the same DNA genetic profile "would be one in 273 quintillion." (Id. at 64.)  On cross-examination, he testified that the "the minor contributor was very minor in this profile, showing up in only five of the 15 DNA locations." (Id. at 74.)

San Gabriel Police Officer Robert Barada testified that he was part of the police pursuit on January 31, 2011, and when he conducted a search along the route afterward, he recovered a black ski mask, a glove, and a black duffle bag. (See id. at 76-78.)  Barada said the duffle bag had miscellaneous jewelry in it. (Id. at 77.)  Officer Barada did not find a gun, a flashlight, any cash, or a white shirt or sweatshirt. (Id. at 80.)

**II.   The Events Surrounding Petitioner's Plea**

A.   Discussions Concerning Plea Negotiations Outside
     Petitioner's Presence

At the telephonic conference conducted outside of Petitioner's presence on September 13, 2012, the court noted that "[t]his is here for jury trial" and asked for "some basic information about this trial." (Lodged Doc. 2, 2 Rep.'s Tr. at 601-02.)

Petitioner's counsel responded,

I did see [Petitioner] in the lockup at the courthouse.
He was very distraught.  He is talking about injuring
himself.  He's also divulged coming into court tomorrow
and asking that I be relieved, and things of that sort.

(Id. at 605.)  Counsel said that Petitioner "is asking to make a counteroffer to the prosecution in the case." (Id.)  The court said, "Let me hear what the offer is outstanding," and the

13

following colloquy occurred:

       [Prosecutor]:  The current offer is 25 years.

       [Petitioner's counsel]:  And [Petitioner] had asked
me to counter at 19 years.

       [Prosecutor]:  I will take 19 years to my supervisor
and discuss it with her today, absolutely.

(Id.)  The court later commented that "in light of the ongoing
discussions with what appears to me to be a very serious
counteroffer — that's a serious amount of time, 19 years — my
inclination . . . is to have you back here first thing tomorrow
morning."  (Id. at 608.)  The court said it would not order a
jury panel until the following week.  (See id. at 608-09.)

The prosecutor objected, stating,

    I am requesting that the court order the panel tomorrow.
    While there is a 19-year offer, and that is a substantial
    amount of time, this case has been through a lot of
    negotiation prior to me getting the case.  And I think
    [Petitioner's counsel] himself actually spoke with my
    head deputy and the two of them personally met on the
    case. . . .  The offer was originally over 27 years, plus
    consecutive time on the residential burglary from 2009.
    And I think my boss came down to 25 years.  I don't
    believe she is likely to come down any lower at all.  So
    I don't believe there is any realistic chance of
    resolving the case tomorrow.

(Id. at 609.)

The court asked Petitioner's counsel for his thoughts, and
counsel said,

14

1  Well, you know, I think it is a fantastic offer by
2  [Petitioner], and I think he's come a long way towards
3  acceptance of responsibility in this case.  I think the
4  court on its own, if the court were inclined to also
5  accept 19 years. . . .  As far as ordering a panel on
6  Monday, I think that is a good idea.

7  (<u>Id.</u>)  The court declined to order a panel for the next day.
8  (<u>Id.</u> at 610.)

9      B.    <u>Further Discussions Before Acceptance of Plea</u>

10      Another hearing was held the next day, with Petitioner and
11 his counsel present.  (<u>See id.</u> at 901.)  The court announced that
12 "we are here for trial" and asked the prosecutor "what the status
13 is concerning any plea negotiations at this point" and "[h]ow
14 would the court get to the 19 years" that Petitioner sought in a
15 plea bargain.  (<u>See id.</u> at 901-02.)  The parties and the court
16 discussed at length how the sentence in Petitioner's other case —
17 the one he had been out on bail on when he committed the crimes
18 in this case — would figure into a plea bargain.  (<u>See id.</u> at
19 902-04.)  They also discussed whether Petitioner had prior
20 "strike" convictions that would affect sentencing calculations
21 and whether the two sentences would have to run consecutively or
22 could run concurrently.  (<u>See id.</u> at 905-10.)  Based on the
23 prosecutor's representations, the court said it understood the
24 People's plea offer to be for 25 years; it added, "I am in effect
25 unable to get to any lower number unless I strike the strike,"
26 and "based upon the information that I heard, [I am] unwilling to
27 do that at this time."  (<u>Id.</u> at 910-11.)

28      Petitioner's counsel then informed the court that Petitioner

wanted to bring a <u>Faretta</u> motion, and the court examined Petitioner about whether he wanted to discharge his counsel and represent himself.  (<u>See</u> <u>id.</u> at 911-12.)  Petitioner told the court that he wanted counsel relieved because "[i]t is just the communication has been off between the firm and himself and myself."[8]  (<u>Id.</u> at 912.)  Petitioner said, "I believe we could have came [sic] to a resolution of this case a long time ago" and that he had "been willing to dissolve [sic] this case."  (<u>Id.</u> at 913.)  The court replied, "Mr. Pollard, let me suggest to you, based upon what I hear, unless you are not willing to take 25 years, you can resolve this case," and Petitioner said, "[y]es, I totally understand that."  (<u>Id.</u>)

The court also told Petitioner that it believed that "no other lawyer" could "get you less than 25 years" "in light of the People's position."  (<u>Id.</u>)  It noted that it had "done [its] best" to try to "move the People down below 25" but was unable to do so.  (<u>Id.</u>)  It acknowledged that in agreeing to 19 years Petitioner was accepting "a lot of time," and "I have reiterated that to the People and have suggested to them that they should reach a resolution."  (<u>Id.</u>)  It noted that "presumably the People will take what I have to say at least as seriously as any private counsel that you might get."  (<u>Id.</u> at 914.)  Petitioner thanked the court for its efforts.  (<u>Id.</u> at 913.)

The court then effectively denied Petitioner's motion to

_____

[8] Petitioner's counsel later explained that he had been part of another law firm that had represented Petitioner and had made earlier appearances in the case, but counsel had since left that law firm but kept Petitioner's case.  (<u>See</u> Lodged Doc. 2, 2 Rep.'s Tr. at 915.)

relieve his counsel, finding that because "they are not willing to budge" it wouldn't "make any difference as to which private counsel . . . you get" (id. at 914); Petitioner eventually pleaded no contest to two counts (id. at 1216).  Right before he did so, the court warned Petitioner that

> I also have to consider the [criminal] history and the charges.  And what I'm telling you is that no additional information is going to cause me to suggest at the front end of the case that I'm willing to strike the strike or that I'm willing to give you a probation offer.  The information will become relevant to this court if in fact you're convicted and you're sentenced.
>
> Now, at that point — I don't want you to read too much into what I'm saying.  At that point, I'll take into consideration as mitigation what you're showing me.  But I'm not suggesting to you that your sentence is going to be any particular sentence.  I can't say that right now, consistent with my obligations and duties as an independent judicial officer.  Do you understand that?

(Id. at 1205.)  Petitioner stated that he did.  (Id.)  The court reiterated that

> I can't do anything for you in terms of the sentence. You have to decide whether you want to accept the People's offer or not because I can't get to a lower point than the 25 years without striking a strike, and I'm telling you I'm not striking a strike at this point.

(Id.)  The prosecutor then noted that if Petitioner went to trial and was convicted, he would ask for the maximum sentence, "over

17

30 years." (<u>Id.</u> at 1207.)  The court asked the prosecutor to clarify exactly what the sentence would be so that Petitioner could "make a thoughtful judgment in this matter," and the prosecutor responded, "32 years 8 months maximum," which defense counsel did not dispute.  (<u>Id.</u> at 1208.)

The court took a recess, and when it reconvened, Petitioner asked for a precise calculation from the prosecutor as to how he arrived at that sentence and wanted to know "whether or not the court agrees with the calculation." (<u>Id.</u>)  The court and counsel then went through the calculation at length, finally determining that the actual maximum sentence for both cases would be 34 years and four months.  (<u>Id.</u> at 1213; <u>see also</u> <u>id.</u> at 1209-13.)

The court then began the plea colloquy with Petitioner, but Petitioner interrupted it "to ask the prosecutor, with the court's permission, whether it's possible to get 23 years plus that 16 months" on the other case, to run concurrently.  (<u>Id.</u> at 1213-14.)  The court and counsel discussed the issue off the record[9] and then took a recess, during which the prosecutor apparently raised the issue with his supervisor.  (<u>Id.</u> at 1214-15.)  The prosecutor subsequently agreed to reduce the sentence to 23 years and eight months as a result of Petitioner's counteroffer (<u>id.</u> at 1215), and Petitioner confirmed in open court that he accepted the plea agreement (<u>id.</u> at 1216).

C.   <u>Trial Judge's Factual Findings</u>

On May 23, 2013, the court set forth a detailed procedural,

---

[9] Petitioner has presented no evidence or argument as to what took place during this or any other off-the-record discussion.

factual, and legal background concerning Petitioner's plea in its
order denying Petitioner's application for a certificate of
probable cause. (<u>See</u> Pet. at 24-31.) As discussed <u>infra</u>,
because even under <u>de novo</u> review the superior court's recitation
of the facts is presumed correct, this Court quotes that order in
pertinent part as follows:

> On September 14, 2012, the parties appeared for
> trial.  At the time, [Petitioner] was represented by
> private counsel, Christopher Darden.  Mr. Darden informed
> the Court that [Petitioner] wanted to address the Court
> directly.   [Petitioner] then explained that he was
> anxious to settle the case short of trial and asked the
> Court for its help in trying to resolve it:

>> I'm almost 100 percent [sic] we can resolve
>> this case.  I just need time, a little time, a
>> small  fraction  of  time  to  get  something
>> together . . . and speak to my family, just to
>> inform   them   exactly   how   all   this
>> works . . . .  Any kind of help you can give
>> me or assistance as far as helping me resolve
>> this, I'd really appreciate it.

> The Court then arranged to allow [Petitioner] to
> speak with his family, who were in the audience.  Before
> doing so, the Court explained that it was unwilling to
> give an indicated sentence lower than the People's offer
> of  25  years,  and  that  he  therefore  had  to  consider
> whether he wanted to reach a disposition with the People.
> The court also informed [Petitioner] that he should not

allow anyone, including his family, to pressure him to make a decision. The Court emphasized that it would not accept [Petitioner]'s change of plea unless it was satisfied that [Petitioner] had not been unduly pressured. [Petitioner] acknowledged that he would have to represent to the Court that he made "a deliberative choice, a thoughtful choice" free from any undue coercion and pressure.

After further reflection and discussion, [Petitioner] made a counter-offer of 23 years. The People then lowered its offer to 23 years and 8 months. [Petitioner] accepted that offer and changed his plea to "no contest" as to the first degree residential robbery charge in Count 1 and the first degree residential burglary charge in Count 4. He also admitted that he personally used a firearm in committing the robbery and that he had suffered a prior strike offense. The Court accepted the change in the plea and the two admissions and found [Petitioner] guilty on Counts 1 and 4 and found true the firearm and prior-conviction allegation. The Court found the plea and waivers were clearly made knowingly, intelligently, voluntarily, and freely. The Court then set sentencing and [Petitioner]'s motion for return of property on October 26, 2012.

On October 15, 2012, [Petitioner] filed a

handwritten letter to the Court.[10]   In that letter, [Petitioner] explained that he had carefully considered whether to enter into the plea agreement and that he remained convinced that it was in his best interest to do so:

> On September 14, 2012, I decided that it was
> in my best interest to plead no contest which
> is the same as a guilty plea.  I must say that
> it feels as if the weight of the world has
> been lifted off my shoulders.

In that letter, [Petitioner] was requesting that the Court allow him to participate in a residential program offered by the Delancey Street Foundation.

The sentencing hearing was continued to November 16, 2012.  At that hearing, Mr. Darden informed the Court that [Petitioner] wished to represent himself and file a motion to withdraw his plea.  The Court granted [Petitioner]'s request after [Petitioner] completed a Faretta waiver form and after speaking with [Petitioner]. The Court then set the matter for further proceedings on November 30, 2012, to ensure that [Petitioner] received all the material he needed to proceed with his motion to withdraw his plea.   The Court also appointed an investigator for [Petitioner].

On November 30, 2012, [Petitioner] informed the Court that he was ready to set a hearing date for his

---

[10] This letter is apparently not in the record.

motion, but requested that the hearing date be scheduled in 60 days.  The Court granted [Petitioner]'s request and set the hearing on February 15, 2013.  On January 28, 2013, [Petitioner] filed his motion to withdraw his plea. In his motion, [Petitioner] raised several issues, alleging that (i) the San Gabriel police department committed misconduct in its investigation (e.g., offering "forged documents" and "deceiving witness[es]"); and (ii) the prosecution engaged in Brady violations. [Petitioner]'s motion was almost entirely conclusory and unsupported by any evidentiary submission other than a general declaration attesting to the conclusory allegations.

Two days before the scheduled hearing, [Petitioner] filed a supplement to his motion.  In the supplement, [Petitioner] raised new issues, including that his counsel was ineffective, that he had not suffered a prior strike conviction (despite his admission on September 14, 2012 that he had suffered that conviction), and that he was induced by an illusory promise to enter into the plea agreement.  Once again, [Petitioner]'s allegations were conclusory and unsupported.  It appears that [Petitioner] was asserting that his counsel was ineffective because he failed "to investigate the true facts in the case," and that he was induced to enter into the plea by the illusory promise by his counsel that he would be allowed "to litigate the merits of the return of [Petitioner]'s property."  [Petitioner] neglected to serve the motion

22

and supplemental papers on the People, necessitating a continuance of the hearing.

On March 1, 2013, the parties appeared for a hearing on the motion.  The Court specifically inquired whether [Petitioner] was ready to proceed with the hearing on his motion.  [Petitioner] stated that he was ready.  The Court then heard extensive argument.  Before ending the hearing, the Court expressly asked [Petitioner] if he had anything further to say.  After giving [Petitioner] an additional opportunity to be heard, the Court inquired whether [Petitioner] was prepared to submit the motion for the Court's decision.  [Petitioner] stated that he was submitting the matter for decision.

The Court denied the motion, explaining:

[Petitioner] entered into a plea agreement on September 14, 2012.  This Court presided over the plea proceedings and carefully monitored those proceedings to make sure that any resulting plea would be made knowingly and voluntarily, and free of any coercion.  The court made a point of this to [Petitioner] during the proceedings.

[Petitioner] accepted the People's offer and entered a "no contest" plea.  It was clear to the Court that the defendant's only material concern was the total amount of time he would be getting under the agreement, and that the final offer of 23 years and 8 months was

23

acceptable to him. It was also clear to the Court that [Petitioner] entered into the agreement of his own free will without any undue coercion, threats, or promises.

After entering the plea, [Petitioner] moved to withdraw it, claiming that the video surveillance was fraudulent or fabricated in some way. The Court understood [Petitioner] to be suggesting that an analysis of the video would support a claim of innocence. Based on the claim, the court was not about to sentence [Petitioner] to more than 23 years in prison without allowing [Petitioner] to have an expert analyze the video. The Court therefore appointed an expert and continued the proceedings.

The Court received the expert's report and independently reviewed the video surveillance that the expert had analyzed. Having done so, the Court is satisfied that the video is not exculpatory. The Court is also satisfied that the other evidence as presented at the preliminary hearing provides a factual basis to support the "no contest" plea. Moreover, the Court found that [Petitioner] was aware of his

fraud claim[11] before he entered his "no contest"
plea.  Indeed, on or about November 30, 2012,
[Petitioner] stated that he had entertained
such a belief before he agreed to the plea.
The Court accordingly found that the fraud
claim did not provide a basis for withdrawing
his plea.

After raising the fraud claim, [Petitioner]
then expanded the scope of his motion to
withdraw his plea, asserting largely conclusory
claims about:  (i) "ineffective assistance of
counsel"; (ii) "police misconduct"; (iii) his
admitted "prior strike conviction["]; and
(iv) being "induced by an illusory promise."

In denying the motion, the Court found that
[Petitioner] failed to support any of his allegations
about police misconduct or ineffective assistance of
counsel.  The Court also concluded, from supporting
documents submitted by the prosecution, that [Petitioner]
indeed had suffered a prior strike conviction for
committing assault with a deadly weapon (i.e., a pipe or
metal object), causing great bodily injury.  It thus
appeared that his admission to a prior strike conviction
had a strong factual basis.  The Court further found that

---

[11] Petitioner's "fraud claim" was apparently his allegation
that police had fabricated evidence having to do with the
surveillance tapes.  He has not renewed that claim in the
Petition.

[Petitioner]'s claim of an "illusory promise" was meritless. This Court specifically addressed the issue with [Petitioner] in open court on September 14, 2012. Immediately after [Petitioner] had changed his plea, Mr. Darden, [Petitioner]'s counsel at the time, notified the Court that his client intended to move for the return of the property found in [Petitioner]'s car on the day he was arrested. The Court had extensive discussion about the subject and scheduled a hearing to "adjudicate" the claim that [Petitioner] was entitled to the return of the property. On April 29, 2013, the Court conducted an evidentiary hearing and granted in part and denied in part [Petitioner]'s motion for the return of property. The Court's ruling is set forth in a minute order dated April 29, 2013.

(Pet. at 26-30 (some citations omitted).)

The court denied the application for a certificate of probable cause, noting that Petitioner had had "a full and fair opportunity to timely present all his claims" but that they did not "rise to the level of probable cause" and were "meritless." (Id. at 30-31.)

D.   The Video Expert

As discussed above, after Petitioner discharged his counsel and moved to withdraw his plea, the court appointed both an investigator and a "video expert" to help Petitioner investigate whether the surveillance videos had been altered or fabricated. (See Lodged Doc. 2, 2 Rep.'s Tr. at 1802-11.) Petitioner has attached to the Petition a copy of a declaration signed on

February 8, 2013, from the court-appointed audio/video expert,
Michael L. Jones. (See Pet., Jones Decl. at 19-20.) Petitioner
submitted the declaration to the state courts. (See Lodged Doc.
2, 2 Rep.'s Tr. at 2728-29; Lodged Doc. 10 at 13-17; Lodged Doc.
12 at 14-18; Lodged Doc. 14 at 26-30.)

Jones declared that the defense investigator gave him one
11-second video clip. (See Jones Decl. ¶ 5.II.) He opined that

> [t]he video contained on the CD is a screen capture of
> the original video, and was not harvested directly from
> the surveillance system. In other words, a party
> utilized a video recording device to capture images of
> the incident projected from a visual monitor.

(Id. ¶ 5.IV.)

Jones went on to declare that "[a]fter analyzing and
enhancing the image(s) of the subject memorialized on the video
in question, the subject appears to be Caucasian or a light
complexioned individual." (Id. ¶ 5.VII.) Jones also declared
that he had reviewed "additional surveillance images" —
apparently still photos — forwarded to him by the Los Angeles
County Sheriff's Department and purportedly depicting "additional
surveillance images from burglary victim Robert Guerrero." (Id.
¶ 6.A.) Jones opined that "[t]he images forwarded to the
Sheriff's by Mr. Guerrero bear a strong resemblance to the
subject memorialized on the video disc in my custody." (Id.)
Jones further opined that "three (3) grainy, photo-copied images"
that were obtained from the Sheriff's Department also portray
"the subject in question." (Id. ¶ 6.C.)

27

1

**STANDARD OF REVIEW**

2
Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and

3
Effective Death Penalty Act of 1996:

4
> An application for a writ of habeas corpus on behalf of

5
> a person in custody pursuant to the judgment of a State

6
> court shall not be granted with respect to any claim that

7
> was adjudicated on the merits in State court proceedings

8
> unless the adjudication of the claim — (1) resulted in a

9
> decision that was contrary to, or involved an

10
> unreasonable application of, clearly established Federal

11
> law, as determined by the Supreme Court of the United

12
> States; or (2) resulted in a decision that was based on

13
> an unreasonable determination of the facts in light of

14
> the evidence presented in the State court proceeding.

15
Petitioner's two claims do not appear to have been

16
"adjudicated on the merits" by the state supreme court, and thus

17
AEDPA's deferential standard of review may not apply. Petitioner

18
raised his claims in habeas petitions to the court of appeal and

19
supreme court. (See Lodged Docs. 10, 12 & 14.) The court of

20
appeal considered the claims on the merits and denied them

21
summarily. (See Lodged Doc. 11.) The California Supreme Court

22
denied his first petition by citing Duvall, 9 Cal. 4th at 474,

23
and Swain, 34 Cal. 2d at 304 (see Lodged Doc. 13 at 2), and

24
denied the second by citing Miller, 17 Cal. 2d at 735 (see Lodged

25
Doc. 15 at 2).

26
The supreme court's citations cast doubt on whether the

27
claims were "adjudicated on the merits" within the meaning of

28
§ 2254(d) and thus whether AEDPA's deferential standard of review

applies.  See Gaston v. Palmer, 417 F.3d 1030, 1038-39 (9th Cir.
2005) (decision citing Swain is not final ruling on merits), as
modified on other grounds by 447 F.3d 1165 (9th Cir. 2006);
Espinoza-Matthews v. McDonald, No. EDCV 03-921-BRO-(CW), 2016 WL
2993961, at *8 (C.D. Cal. Feb. 12, 2016) (California Supreme
Court decision citing Swain and Duvall was not on merits for
purposes of AEDPA review), accepted by No. EDCV 03-921-BRO-(LAL),
2016 WL 2993951 (C.D. Cal. May 24, 2016); Carter v. Scribner, No.
2:04-cv-00272-MSB, 2009 WL 4163542, at *6 (E.D. Cal. Nov. 23,
2009) (citation to Miller is procedural dismissal that does not
constitute adjudication on merits), aff'd, 412 F. App'x 35 (9th
Cir. 2011).

Respondent concedes that Petitioner's claims "appear to be
exhausted" and does not argue that they are procedurally
defaulted.  (See Answer at 2.)  Accordingly, Respondent has
waived any procedural-default argument.  See Chaker v. Crogan,
428 F.3d 1215, 1220-21 (9th Cir. 2005).

Respondent nonetheless argues that AEDPA deference applies
because the court of appeal's merits denial is "the relevant
adjudication for purposes of 28 U.S.C. § 2254(d) review of the
claims," and "[t]his is so notwithstanding the California Supreme
Court's subsequent rejection of those claims based on Swain,
Duvall, and In re Miller."  (Answer at 9.)

Respondent cites four cases in support of his argument:
Harrington v. Richter, 562 U.S. 86, 98 (2011); Greene v. Fisher,
132 S. Ct. 38, 45 (2011); Gonzalez v. Brown, 585 F.3d 1202, 1206
(9th Cir. 2009); and Ramsey v. Yearwood, 231 F. App'x 623, 624-25
(9th Cir. 2007).  Three of those cases are readily distinguished,

29

however, because the supreme-court denials at issue were "silent"
and thus were presumptively on the merits, see Johnson v.
Williams, 133 S. Ct. 1088, 1096-97 (2013); the federal habeas
court was therefore authorized to "look through" to the lower
state-court opinions.   See Richter, 562 U.S. at 98-100
(discussing unexplained summary denial from state supreme court);
Gonzalez, 585 F.3d at 1205-06 (concerning apparent summary denial
of discretionary review by California Supreme Court); Ramsey, 231
F. App'x at 624-25 ("look[ing] through" silent denial from
California Supreme Court).

     Greene provides the strongest support for Respondent's
argument.  In Greene, the U.S. Supreme Court examined whether
"clearly established federal law" included decisions of the Court
that were announced after the last state-court adjudication of
the merits of a petitioner's claims but before the petitioner's
conviction became final.  See 132 S. Ct. at 42.  The petitioner
in Greene had presented a claim to the state appellate court,
which denied it on the merits; the state's highest court allowed
an appeal but then dismissed it as "improvidently granted."  See
id. at 42-43.  Petitioner argued that he was entitled to the
benefit of the Supreme Court decision even though it postdated
the last state merits determination.  See id. at 44.  The Supreme
Court rejected the argument:

     The words "the adjudication" in the "unless" clause
     obviously refer back to the "adjudicat[ion] on the
     merits," and the phrase "resulted in a decision" in the
     "unless" clause obviously refers to the decision produced
     by that same adjudication on the merits.  A later

30

affirmance of that decision on alternative procedural grounds, for example, would not be a decision resulting from the merits adjudication.  And much less would be (what is at issue here) a decision by the state supreme court not to hear the appeal — that is, not to decide at all.

Id. at 45.  The Court proceeded to apply AEDPA deference to the claims even though the state supreme court had never considered their merits.  Id.  Respondent argues that Greene stands for the proposition that a later supreme-court "affirmance" of an earlier court-of-appeal decision "on alternate procedural grounds" does not preclude review under AEDPA when the court-of-appeal decision was on the merits.  (See Answer at 9-10.)

But here there is no "affirmance on alternate procedural grounds."  The supreme court's denials of Petitioner's habeas petitions with citations to Duvall, Swain, and Miller were not affirming the court of appeal but were akin to the grant of a demurrer allowing leave to amend.  See, e.g., Gaston, 417 F.3d at 1039; Kim, 799 F.2d at 1319.  The supreme court thus arguably left open the door for Petitioner to obtain further review of his claims if he stated them more particularly.  Further, because the supreme court's decisions were "reasoned," this court may not look through them to the court of appeal's decision.  See Fox v. Johnson, 832 F.3d 978, 986 (9th Cir. 2016) (holding that summary denial with single case citation was "reasoned" and, because respondent waived procedural-default argument, reviewing de novo).

In any event, as explained infra, Petitioner's claims fail

31

even when reviewed <u>de novo</u>.  See <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in <u>de novo</u> review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on <u>de novo</u> review[.]"); <u>see also</u> <u>Chaker</u>, 428 F.3d at 1220-21 (when state fails to raise procedural default and state court never adjudicated claim on merits, federal habeas court reviews <u>de novo</u>).

When a federal habeas court conducts <u>de novo</u> review, it is "unencumbered by the deference AEDPA normally requires," and its analysis proceeds under § 2254(a).  See <u>Hardy v. Chappell</u>, 832 F.3d 1128, 1137 (9th Cir. 2016) (citing <u>Frantz v. Hazey</u>, 533 F.3d 724, 735-37 (9th Cir. 2008) (en banc)).  When the reasoning of a state court, even a trial court, is relevant to resolution of constitutional issues, that reasoning may be part of a federal habeas court's consideration even under <u>de novo</u> review.  See <u>Frantz</u>, 533 F.3d at 738 (focusing, under <u>de novo</u> review, on "trial court's reasoning to determine whether a constitutional violation occurred").

Further, even under <u>de novo</u> review, this Court still presumes the correctness of state-court factual findings and generally defers to those findings absent clear and convincing evidence to the contrary.  See <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002) (citing § 2254(e)); <u>Mayfield v. Woodford</u>, 270 F.3d 915, 922 (9th Cir. 2001) (en banc) (under pre-AEDPA <u>de novo</u> standard, federal court presumes state-court findings of fact are correct and defers to those findings in absence of

"convincing evidence" to contrary or "demonstrated lack of fair support" in record (citations omitted)).[12]

**DISCUSSION**

**I.  Petitioner's Claim Concerning the Trial Court's Participation in Plea Negotiations Does Not Warrant Habeas Relief**

Petitioner argues that the trial court violated his rights by (1) inserting itself into plea negotiations in violation of Federal Rule of Criminal Procedure 11; (2) improperly influencing or coercing Petitioner to accept a plea bargain with an "illusory promise" that misrepresented Petitioner's eligibility for a work program and what Petitioner's sentence would be; and (3) refusing to allow Petitioner to withdraw his plea.

A.  <u>Violation of Rule 11</u>

The heading for this subclaim reads, "Trial judge improperly participated in plea discussions, in violation of Federal Rules of Criminal Procedure, rule 11(c)(1)."  (Pet. at 5.) Petitioner's claim is unavailing.[13]  Federal rules of procedure generally do not apply in state-court proceedings.  <u>See</u> <u>Southland</u>

---

[12] Petitioner's claims are arguably unexhausted.  A federal habeas court may not deny an unexhausted claim unless it is not even "colorable."  <u>See</u> <u>Cassett v. Stewart</u>, 406 F.3d 614, 616 (9th Cir. 2005) (federal habeas court may deny unexhausted claim when it is "perfectly clear" that claim is not "colorable").  As explained herein, that is the case with Petitioner's claims.

[13] Federal Rule of Criminal Procedure 11, entitled "Pleas," sets forth federal "Plea Agreement Procedure" and provides, in pertinent part, that "[a]n attorney for the government and the defendant's attorney, or the defendant when proceeding <u>pro se</u>, may discuss and reach a plea agreement," but "[t]he court must not participate in these discussions."  <u>See</u> Fed. R. Crim. P. 11(a), (c)(1).

1  Corp. v. Keating, 465 U.S. 1, 16 n.10 (1984).  A California judge
2  is not bound by those rules, moreover, and the rules are not
3  "laws" whose "violation" by a state court, without more, can form
4  the basis for a federal habeas claim.  See, e.g., United States
5  v. Davila, 133 S. Ct. 2139, 2149 (2013) (holding that Rule 11 was
6  adopted as prophylactic measure, "not one impelled by the Due
7  Process Clause or any other constitutional requirement"); Loftis
8  v. Almager, 704 F.3d 645, 648 (9th Cir. 2012) ("While Fed. R.
9  Crim. P. 11 and its state analogs require additional safeguards,
10 violations of such rules do not ordinarily render a plea
11 constitutionally infirm and thus vulnerable to collateral
12 attack." (citing, among others, Estelle v. McGuire, 502 U.S. 62,
13 68 n.2 (1991)).

14     Accordingly, Petitioner is not entitled to relief on his
15 Rule 11 claim.

16     B.   Petitioner's Plea and Motion to Withdraw It

17     Petitioner complains that shortly before trial was scheduled
18 to start, the trial judge improperly inserted himself into plea
19 negotiations, and because Petitioner's counsel was ineffective,
20 Petitioner was "starting to feel pressure."  (Pet., Mem. P. & A.
21 at 2 (citing Lodged Doc. 2, 2 Rep.'s Tr. at 902, 1203).)

22     Before Petitioner pleaded no contest, his counsel told the
23 judge that Petitioner wanted to present "a letter from Delancey
24 Street Foundation," "an alternative incarceration program that
25 the Petitioner had applied to," and "through a 3-step
26 interviewing process the Petitioner received an acceptance letter
27 into the program by US mail."  (Id. at 2-3.)  Petitioner avers
28 that based on the colloquy that followed, he formed the

34

impression that he could accept a plea bargain but nevertheless
be diverted to a two- or four-year program at Delancey Street in
spite of whatever sentence Petitioner agreed to in the plea
bargain. (See id. at 3-4 (citing Lodged Doc. 2, 2 Rep.'s Tr. at
916)). Petitioner acknowledges, however, that his counsel also
told the court that "these are the kind of things I would present
in a Romero motion in the event [Petitioner] was convicted prior
to sentencing." (See id. at 3 (citing Lodged Doc. 2, 2 Rep.'s
Tr. at 916-18).)[14] Petitioner notes that the trial court said it
would "certainly" take into consideration "this information
if . . . [Petitioner] were convicted in this matter." (Id.
(citing Lodged Doc. 2, 2 Rep.'s Tr. at 918).) Petitioner avers
that "[t]his statement by the judge was the beginning of the
undue coercion created by the court by participating in plea
discussions which had not been agreed upon in open court." (Id.)
Petitioner goes on to state that after he pleaded no contest he
"discovered through petitioner's own legal research that
petitioner never had a chance to participate in the Delancey
Street Program due to petitioner's prior history." (Id. at 5.)

      1.   *Additional Background*

    The trial judge addressed Petitioner's claims in numerous

---

[14] A so-called "Romero motion," see Cal. Penal Code § 1385,
is a request for dismissal of a prior "strike" conviction that
could be used to enhance a sentence under California's Three
Strikes Law. See People v. Superior Court (Romero), 13 Cal. 4th
497 (1996); see also Daire v. Lattimore, 818 F.3d 454, 466 (9th
Cir. 2016) (when defendant brings Romero motion, judge may
disregard prior felony for sentencing purposes under California's
Three Strikes Law, but "denial of a Romero motion is generally
the expectation, not the exception").

hearings, and it set forth its findings in three written orders:
(1) a minute order dated April 2, 2013 (Lodged Doc. 1, Clerk's
Tr. at 191-92), (2) a minute order dated April 15, 2013 (id. at
213-14), and (3) the Order Denying Application for Certificate of
Probable Cause filed on May 23, 2013 (see Pet. at 24-31).

     At a hearing on September 14, 2012, with Petitioner present,
the trial court inquired "what the status is concerning any plea
negotiations at this point"; neither Petitioner nor his counsel
raised any objection.  (See id. at 902-03.)  Petitioner addressed
the court at that hearing, saying, "I believe we could have came
[sic] to a resolution of this case a long time ago," and "[l]ike
I said, I have been willing to dissolve [sic] this case."  (Id.
at 913.)  The trial judge shared his thoughts on sentences
proposed in plea negotiations to that point, and Petitioner said
"Yes, sir" and "I thank you for that."  (Id.)  Later that same
day, Petitioner informed the court that "I would like to resolve
the case, and I think we can resolve the case" — "I'm almost 100
percent we can resolve the case."  (Id. at 1202.)  He asked for
"any kind of help" or "assistance" the court could give him.
(Id. at 1203.)

     The court went on to explain that Petitioner could accept
the prosecution's plea offer, or "you could say I want to stand
on my constitutional rights, I want to challenge this case at a
jury trial."  (Id. at 1205-06.)  He asked Petitioner to "[b]ear
in mind that you should not allow anyone to pressure you . . .
[a]nd you should feel no pressure . . . [b]ut ultimately the
decision has to be yours."  (Id. at 1206.)

     Finally, the court stated as follows:

                                36

1   If you decide that you want to accept the offer after
2   speaking with your family members, you have to be able to
3   look me in the eye and honestly tell me that: this is my
4   decision.  I'm not being pressured or forced by anyone
5   else to accept this deal.  This is my decision.  I may
6   feel some pressure because of the circumstances, in other
7   words, I'm looking at a lot of time.  But ultimately I've
8   made a deliberative choice, a thoughtful choice, and I've
9   decided that I want to accept the offer. . . .  Do you
10  understand what I'm telling you?

11  (Id. at 1206.)  Petitioner responded, "Yes, sir."  (Id.)

12  Shortly before Petitioner pleaded no contest, his counsel
13  communicated Petitioner's request to be referred to the Delancey
14  Street program, which, in Petitioner's own words, was meant to
15  "help[] someone like myself — ex-cons."  (Id. at 916, 918.)  The
16  trial court stated that although it "certainly would take into
17  consideration this information if, in fact, [Petitioner] were
18  convicted in this matter, it does not provide a basis for the
19  court at this time to give any type of indicated sentence."  (Id.
20  at 916.)

21  The following colloquy then occurred:

22      The Court:  Is it your hope that the court is going
23  to somehow give you an indicated sentence on probationary
24  terms at the outset of the case?  Is that what you are
25  hoping?

26      [Petitioner]:  No, sir.

27      The Court:  What is it that you hope to accomplish
28  with respect to presenting this information to another

37

1    lawyer, to the court, or to myself?

2        [Petitioner]:  Well, what I am hoping to get is, I

3    have been getting different information from different

4    members of the firm.[15]  So in my mind — my mind is going

5    in circles.

6        The Court:  That is what I am trying to explain to

7    you.  And I understand where you are coming from.  What

8    I am trying to explain to you is that this information

9    that you seek to present to the Court —

10       [Petitioner]:  Yes, sir.

11       The Court:  — is useful information potentially?

12       [Petitioner]:  Yes, sir.

13       The Court:  But its usefulness is only going to come

14   about —

15       [Petitioner]:  Yes, sir.

16       The Court:  — if you are convicted in this case.

17       [Petitioner]:  Yes, sir.

18   (Id. at 919.)  The court then clarified that such information was

19   "premature" and would not be "particularly useful at this time."

20   (Id. at 920.)  It also commented that "right now Mr. Darden is

21   undoubtedly focused on trying this case . . . trying to avoid a

22   conviction so sentencing isn't necessary."  (Id. at 921.)  The

23   court eventually took Petitioner's no-contest plea at that same

24   hearing, and Petitioner got the prosecutor to agree to his

25   counteroffer of a total sentence of 23 years and eight months,

26

27   _____

28       [15] This presumably refers to attorney Darden's former law
     firm.

38

with no further mention of the Delancey Street program.  (<u>See</u> <u>id.</u> at 1208-26.)

At a hearing on March 1, 2013, about Petitioner's motion to withdraw his plea, the trial court stated that "I also have reviewed yet again the transcript of the hearing of the taking of the plea on September 14 of 2012," and

> I also have received and reviewed a letter that was sent
> to the court by [Petitioner] on October 11, 2012.  And
> that was shortly after the court took the plea and
> [Petitioner] wrote a note indicating that he wished to be
> given a Delancy [sic] Street Foundation alternative to a
> straight-out prison sentence.

(<u>Id.</u> at 2701-02.)

The trial court stated that it had personally reviewed the evidence in the case, including the surveillance videos, and found it "substantial."  (<u>Id.</u> at 2709-10.)  The judge quoted from the October 11 letter, stating that Petitioner had said that "I must say that it feels as if the weight of the world has been lifted off my shoulders" as a result of the plea.  (<u>Id.</u> at 2710.) The court then asked Petitioner for clarification about why he sought to withdraw his plea.  (<u>See</u> <u>id.</u> at 2713.)

Petitioner stated that "I am asserting that I am factually innocent," and he said that "[w]hat I'm saying to you [is] . . . I expressed to [ex-counsel] the chain of events totally and truthfully . . . [and h]e totally lied to me and did not investigate the chain of events."  (<u>Id.</u>)  Petitioner went on to state that "I understand that someone else that fits the description has been out there committing the crimes," and "I am

not that person." (<u>Id.</u>)  Petitioner said, "This has nothing to
do with the prison time" and "is all about coming totally clean."
(<u>Id.</u>)

     When the trial court asked Petitioner why, then, he had
accepted the plea deal, Petitioner stated, "[t]hat plea was
entered because on the . . . faulty advice of counsel that if I
didn't take some sort of deal, that I would spend the rest of my
life and possibly die." (<u>Id.</u> at 2714.)  Petitioner said his
ex-counsel "expressed to me that people find love in their old
age; you need to take the deal." (<u>Id.</u>)  Petitioner did not make
any allegations concerning Delancey Street or the trial court's
participation in the plea negotiations.

     The court then noted that it had conducted lengthy plea
proceedings and endeavored to make sure that Petitioner was
"entering this plea agreement freely, voluntarily, and of your
own volition." (<u>Id.</u> at 2714-15.)  "So when you tell me that you
were feeling pressured and that you entered into this decision in
effect because someone else forced you to do so, because your
counsel in effect pressured you to do so, I must tell you that is
not consistent with my finding of facts in this matter." (<u>Id.</u> at
2715.)

     Petitioner then asked the court to allow him "to speak on
the illusionary [sic] promise that I would receive my property,"
which Petitioner asserted was made "[b]y the court, by the
prosecution, and [by] my attorney." (<u>Id.</u> at 2715-16.)
Petitioner stated that "I'm referring to my counsel promised me
that I would be able to get my property upon that plea." (<u>Id.</u> at
2716.)

The trial court responded,

> The court finds that there was no illusory promise that
> was relied upon. . . . The reason the court makes that
> finding is because not only did you acknowledge . . . in
> open court that there were no promises made to you, other
> than those that were made in open court that were
> transcribed, but the transcription of the record will
> show that there were no promises made to you other than
> the court would conduct a contested hearing on the
> ownership of the property held by the Agency in the event
> that the parties could not reach a mutually agreeable
> resolution. . . . And the court does intend to conduct
> such a hearing . . . . [But t]hat contested hearing has
> been aborted because of the motion to withdraw the plea.

(Id. at 2717-18.)

Petitioner then complained that his counsel had inadequately advised him about the nature of his prior "strike" conviction. (See id. at 2720-23.)  He gave other reasons for wanting to withdraw his plea as well: "police misconduct of the DNA reports, on the chain of custody," the court-appointed video expert finding that the person in the video looked "Caucasian," and the criminalist testifying at the preliminary hearing that DNA from two contributors, one of them Caucasian, was found on the ski mask.  (Id. at 2725, 2728.)

The court then commented,

> [T]he court did review the declaration by the person
> reviewing the video.  The person reviewing the video
> makes appropriate note that the quality of the image is

41

1       less than ideal. . . .   The declarant further notes that
2       the person appears to be Caucasian or light complexion.
3       I will tell you that, based upon my own review of that
4       [video], it was impossible to tell the race of the person
5       involved.    It   looked   like   the   person   was   lighter
6       complexion; although it's not clear to me whether that
7       was attributable to the lighting or whether that was, in
8       fact, something that a person viewing the video could
9       accurately ascertain. . . .   I will note that you are a
10      light-skinned African-American, quite light-skinned, in
11      my view.   And I will also note that your body type
12      appears to match the body type that I saw on that video.
13  (Id. at 2728-29.)

14      Petitioner objected to the trial court's findings (see id. at
15  2729), but the court stated,

16      I looked at the video with in mind [sic] the purpose for
17      which you had presented it, which was that the videotape
18      in effect exonerates you.   And in my judgment, the
19      videotape, which you have presented along with the
20      declaration, does not do so . . . . [I]f I thought that
21      it did, I would be very reluctant, of course, to accept
22      a guilty plea in this case and to sentence you in this
23      matter.

24  (Id.)

25      Petitioner then said that "I never said that the videotape
26  exonerates me." (Id. at 2730.) Petitioner went on to state that
27  "I would like to request . . . to withdraw my plea because I was
28  promised that I would receive my property." (Id. at 2731-32.)

                                42

The trial court took Petitioner's motion to withdraw his plea under submission. (Id. at 2732.)

As noted, in a minute order dated April 2, 2013, the trial court denied the motion. (See Lodged Doc. 1, Clerk's Tr. at 191-92.)  The court noted that Petitioner originally moved to withdraw his plea because he claimed "that the video surveillance was fraudulent or fabricated in some way." (Id. at 191.)  But "[a]fter raising the fraud claim, [Petitioner] then expanded the scope of his motion to withdraw his plea, asserting largely conclusory claims about: . . . (iv) being 'induced by an illusory promise.'" (Id.)  The court observed that "[a]s more fully stated on March 1, 2013, the court found these additional grounds to be unsupported and meritless." (Id.)

The trial court issued a minute order on April 15, 2013, which primarily concerned "whether the court had to consider the strike offense in [the other] case . . . for which [Petitioner] was convicted and is now before this court for sentencing." (Id. at 213.)  The court found that the plea agreement was enforceable notwithstanding any issues with how Petitioner should be sentenced on the two cases. (See id. at 214.)

In the May 23, 2013 order denying Petitioner a certificate of probable cause, the trial court stated,

> [Petitioner] had a full and fair opportunity to timely present all his claims – including any factual support for the claims – before this Court.  This Court decided the motion [to withdraw the plea] after giving [Petitioner] a substantial amount of time to develop and present his claims.  The Court then afforded [Petitioner]

43

an opportunity to present oral argument.  [Petitioner]
represented to the Court that he was ready to proceed
with the hearing on his motion, and after arguing, he
informed the Court that he was ready to submit the matter
for disposition.  Accordingly, the Application appears to
be meritless and is hereby denied.

(Pet. at 30-31.)

　　　　2.  *Applicable Law*

The 14th Amendment requires that when a criminal defendant
enters into a guilty or no-contest plea, the defendant must act
knowingly, intelligently, and voluntarily.  See Boykin v.
Alabama, 395 U.S. 238, 242-44 (1969); Loftis, 704 F.3d at 647.
The standard for determining the validity of a guilty plea is
"whether the plea represents a voluntary and intelligent choice
among the alternative courses of action open to the defendant."
North Carolina v. Alford, 400 U.S. 25, 31 (1970); see also
Bradshaw v. Stumpf, 545 U.S. 175, 183 (2005) (guilty plea is
valid "only if done voluntarily, knowingly, and intelligently,
with sufficient awareness of the relevant circumstances and
likely consequences").  The record must reflect that the
defendant understood the nature of the charges against him and
the consequences of his plea, and that he relinquished his
privilege against self-incrimination, his right to trial by jury,
and his right to confront his accusers.  See Loftis, 704 F.3d at
647.  Beyond these essentials, "the Constitution 'does not impose
strict requirements on the mechanics of plea proceedings.'"  Id.
at 648 (quoting United States v. Escamilla-Rojas, 640 F.3d 1055,
1062 (9th Cir. 2011)).

44

1   Nevertheless, a guilty plea may be involuntary when it is
2   induced by threats, misrepresentations, or promises "that are by
3   their nature improper." Mabry v. Johnson, 467 U.S. 504, 509
4   (1984), overruled in part on other grounds by Puckett v. United
5   States, 556 U.S. 129 (2009); see also Brady v. United States, 397
6   U.S. 742, 750 (1970) ("[T]he agents of the State may not produce
7   a plea by actual or threatened physical harm or by mental
8   coercion overbearing the will of the defendant."); Doe v.
9   Woodford, 508 F.3d 563, 570 (9th Cir. 2007) (guilty plea may be
10  coerced when defendant is induced by promises or threats that
11  deprive plea of nature of voluntary act (citation and alterations
12  omitted)).

13      To determine the voluntariness of a plea, a federal habeas
14  court looks to the "totality of the circumstances," examining
15  both the defendant's "subjective state of mind" and the
16  "constitutional acceptability of the external forces inducing the
17  guilty plea." Woodford, 508 F.3d at 570. When a judge is
18  alleged to have coerced a defendant to plead guilty through his
19  participation in plea negotiations, "[t]he critical inquiry . . .
20  is whether the judge's conduct rendered [the] [p]etitioner's plea
21  involuntary." Robinson v. Chavez, No. CV 09-9324 CAS (JCG), 2011
22  WL 3896944, at *7 (C.D. Cal. July 20, 2011) (citing Brady, 397
23  U.S. at 748), accepted by 2011 WL 3896937 (C.D. Cal. Sept. 2,
24  2011). Finally, "[a] habeas petitioner bears the burden of
25  establishing that his guilty plea was not voluntary and knowing."
26  Little v. Crawford, 449 F.3d 1075, 1080 (9th Cir. 2006).

27          3.  *Analysis*
28      Petitioner is not entitled to federal habeas relief because

45

nothing shows that the trial judge "coerced" him or made any "misrepresentations" or "illusory promises," and thus it did not err in denying his request to withdraw his plea.

As an initial matter, Petitioner was not present for some of the trial court's discussion with counsel concerning the plea negotiations, and thus any comments it made at that time could not have influenced Petitioner one way or the other.

Moreover, as the trial judge reasonably set forth in the multiple orders referenced above, the record reflects that far from "coercing" Petitioner into taking a plea, the court was especially solicitous of him throughout the proceedings and, in particular, during the plea hearing.  Indeed, the court generally participated simply by "explain[ing] the prosecution's position and the potential sentence [p]etitioner was facing" rather than injecting its own personal views into the proceedings.  See Robinson, 2011 WL 3896944, at *7.  To the extent it did more than that, it did not coerce or intimidate Petitioner.

The record reflects that Petitioner made a voluntary choice to plead guilty.  In response to the trial court's questions, Petitioner acknowledged, among other things, that he had thought "about this carefully"; he was not pressured by anyone to accept the deal; and he had had enough time to consider the deal and wanted to accept it.  (See Lodged Doc. 2, 2 Rep.'s Tr. at 1217.) The trial court went on to advise Petitioner of the rights he was waiving by pleading guilty, and Petitioner accepted each of those waivers.  (See id. at 1217-19.)  The court asked, "Has anyone threatened you or anyone close to you to get you to enter into a plea agreement and plead either guilty or no contest here

46

today?," and Petitioner responded, "[n]o, sir." (<u>Id.</u> at 1220.)

The record also reflects that the trial court made no "misrepresentations" to Petitioner and, in particular, made no "illusory promise" to Petitioner about the possibility of participating in the Delancey Street program and receiving a reduced sentence.  The court explicitly told Petitioner, at numerous points throughout the preplea and plea proceedings, that participation in the Delancey Street program and the chance of a reduced or probationary sentence would only possibly be available and would not even be considered until after Petitioner was convicted.  (<u>See, e.g.</u>, <u>id.</u> at 919, 1204.)

For example, the court asked Petitioner, "[i]s it your hope that the court is going to somehow give you an indicated sentence on probationary terms at the outset of the case?," and Petitioner replied, "[n]o, sir." (<u>Id.</u> at 919.)  The court explained that the information about the Delancey Street program "is useful information potentially . . . but its usefulness is only going to come about . . . if you are convicted in this case," to which Petitioner stated, numerous times, "[y]es, sir." (<u>Id.</u>)  The trial court went on to tell Petitioner, before he pleaded no contest, that "there isn't anything at this point that you can present to the court . . . that would cause me, at this point in time, to strike a strike or to give you a disposition an indicated sentence that would be probation in nature," and Petitioner replied, "[y]es, sir." (<u>Id.</u> at 1204.)

What Petitioner describes is, at best, his own mistake or misapprehension; he can point to no misrepresentation or "illusory promise" made by the trial court that improperly

47

induced him, much less "coerced" him, to accept the plea deal.
See Turner v. Calderon, 281 F.3d 851, 881 (9th Cir. 2002) (self-
serving statement, made years later, that petitioner was
misinformed is insufficient to undermine guilty plea).  The
conclusion that Petitioner's allegations are self-serving is
buttressed by the fact that Petitioner complained in the trial
court that the "illusory promise" of having his property returned
influenced him to plead no contest, but later, in his habeas
petitions to the state courts, he complained that the "illusory
promise" was participation in the Delancey Street program.
Petitioner appears to have floated one "illusory promise"
argument after another in a self-serving attempt to latch onto a
winning theory.

       For the most part, "the judge remained neutral and took
great pains to ensure that Petitioner's plea was voluntary and
based on a complete understanding of his rights and the
consequences of his plea."  See Robinson, 2011 WL 3896944, at *7;
cf. Crater v. Galaza, 491 F.3d 1119, 1132 (9th Cir. 2007) (when
judge did not perform incompatible accusatory and judicial roles
in regard to plea bargain but only "encouraged" plea-bargain
process, habeas relief on bias claim not warranted).  When the
judge arguably strayed from neutrality it was to help Petitioner,
trying to get the People to agree to a lighter sentence, for
instance, or making arrangements for Petitioner to speak with his
family about the plea.  Indeed, far from being intimidated by the
judge's participation, Petitioner solicited it and more than once
thanked the judge for his efforts.  Petitioner also repeatedly
spoke up when he wanted more information or a better deal — and

almost always got what he asked for.  Because the trial court did not coerce Petitioner's plea or intimidate him in any way, it also did not err when it denied his request to withdraw his plea.[16]

## II.  Petitioner's Ineffective-Assistance-of-Counsel Claim Does Not Warrant Habeas Relief

Petitioner contends that his counsel was ineffective because he failed to adequately review the surveillance videos from the two victims' homes — what Petitioner calls the prosecution's "main evidence" — and failed to retain an expert to review the videos, which would have led to reasonable doubt concerning his guilt.  (See Pet. at 5, Mem. P. & A. at 5-6.)  Petitioner complains that if defense counsel had conducted a proper investigation, Petitioner would not have pleaded no contest. (See id.)

### A.   Additional Background

At a hearing on February 15, 2013, Petitioner advised the court that he was submitting Jones's declaration as part of his motion to withdraw his plea.  (Lodged Doc. 2, 2 Rep.'s Tr. at 2403.)  The court asked Petitioner if the video and the still photos that Jones had reviewed "pertain[] to the January 30th

---

[16]   To the extent Petitioner argues that the trial court erred under California law, his claim is not cognizable on federal habeas review.   See Estelle, 502 U.S. at 70; see also Nicholson v. Johnson, No. 2:13-cv-2407 JAM DAD P, 2015 WL 1637977, at *11 (E.D. Cal. Apr. 13, 2015) (claim that state court abused its discretion under state law in denying petitioner's motion to withdraw no-contest plea was not cognizable in federal habeas proceeding), request for cert. of appealability denied, No. 15-16475 (9th Cir. June 2, 2016).

1   event with Mr. Guerrero," and Petitioner said "yes." (<u>Id.</u> at
2   2406.)   The court confirmed that "[t]he video that [Jones] was
3   not able to analyze . . . was the video of the chase, if you
4   will, which relates to the January 31st event, correct?," and
5   Petitioner said "yes." (<u>Id.</u>)   Petitioner complained that the
6   disk that Jones reviewed had not been authenticated because it
7   "was recorded from someone's device, I believe . . . one of the
8   officer's device cell phone, micro recorder, or something
9   . . . ." (<u>Id.</u> at 2407.)   Petitioner objected that the video
10  pertaining to the incident at Tran's house was played at the
11  preliminary hearing, but he did not have a copy of it. (<u>Id.</u> at
12  2407-08.)

13      At a hearing on March 1, 2013, the trial court stated that
14  it had reviewed Jones's declaration and the transcript of the
15  preliminary hearing. (<u>Id.</u> at 2701, 2709-10.)   Petitioner
16  asserted that "I am factually innocent," and he argued that his
17  defense counsel "totally lied to me and did not investigate the
18  chain of events." (<u>Id.</u> at 2713.)   Petitioner went on,

19          I just would like to state that pertaining to the video
20          expert's report, that in his opinion the individual was
21          a Caucasian.   And I would like to note that it was the
22          criminalist's statement that it was two sets [of DNA on
23          the ski mask] — that there was two contributors.   And the
24          criminologist stated that one was African-American and
25          one was Caucasian.
26  (<u>Id.</u> at 2728.)

27      As noted, the trial judge stated that he had reviewed the
28  video and in his opinion, the video could possibly depict

50

Petitioner because he was a "quite light-skinned" African-American whose body type matched the person in the video. (See id. at 2728-29.)  Although the trial judge stated that he was not, in fact, concluding that Petitioner was the person in the video, the video did not exonerate Petitioner. (See id. at 2729.)

The court then denied Petitioner's motion to withdraw his plea. (See id. at 2732-35.)  In particular, the court stated, "[t]he court also finds without support the assertion of ineffective assistance of counsel," and that "even to the extent that there was any ineffective assistance of counsel, that it was not prejudicial to [Petitioner]." (Id. at 2734.)  The court then summarized its reasoning:

> [Petitioner] had full information as to what was the
> prosecution's case and the evidence that they had. In my
> view, that evidence was strong evidence. Based upon my
> review of the preliminary hearing, and my review of the
> additional information that has been presented to the
> court, it appears that [Petitioner] was looking at a
> difficult case in front of him, recognized it as such,
> and decided to take the deal because of that evaluation,
> not based upon any other facts or circumstances.

(Id. at 2734.)

Further, as noted above, the trial court's April 2, 2012 minute order also set forth its reasoning:

> The court received the expert's report and independently
> reviewed the video surveillance that the expert had
> analyzed. Having done so, the court is satisfied that

51

1    the video is not exculpatory.  The Court is also
2    satisfied that the other evidence as presented at the
3    preliminary hearing provides a factual basis to support
4    the "no contest" plea.
5  (Lodged Doc. 1, Clerk's Tr. at 191.)
6       B.   Applicable Law
7       Under Strickland v. Washington, 466 U.S. 668, 687 (1984), a
8  petitioner claiming ineffective assistance of counsel must show
9  that counsel's performance was deficient and that the deficient
10  performance prejudiced his defense.  "Deficient performance"
11  means unreasonable representation falling below professional
12  norms prevailing at the time of trial.  Id. at 688-89.  To show
13  deficient performance, the petitioner must overcome a "strong
14  presumption" that his lawyer "rendered adequate assistance and
15  made all significant decisions in the exercise of reasonable
16  professional judgment."  Id. at 689-90.  Further, the petitioner
17  "must identify the acts or omissions of counsel that are alleged
18  not to have been the result of reasonable professional judgment."
19  Id. at 690.  The initial court considering the claim must then
20  "determine whether, in light of all the circumstances, the
21  identified acts or omissions were outside the wide range of
22  professionally competent assistance."  Id.
23       The Supreme Court has recognized that "it is all too easy
24  for a court, examining counsel's defense after it has proved
25  unsuccessful, to conclude that a particular act or omission of
26  counsel was unreasonable."  Id. at 689.  Accordingly, to overturn
27  the strong presumption of adequate assistance, the petitioner
28  must demonstrate that the challenged action could not reasonably

be considered sound trial strategy under the circumstances of the case.  Id.

    To meet his burden of showing the distinctive kind of "prejudice" required by Strickland, the petitioner must affirmatively

> show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694; see also Richter, 562 U.S. at 111 ("In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently.").

    Strickland applies to challenges to the validity of guilty pleas based on alleged ineffective assistance of counsel.  See Hill v. Lockhart, 474 U.S. 52, 58 (1985); see also Missouri v. Frye, 132 S. Ct. 1399, 1405 (2012).  To establish prejudice, however, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Hill, 474 U.S. at 59; see also Padilla v. Kentucky, 559 U.S. 356, 372 (2010) (petitioner "must convince the court that a decision to reject the plea bargain would have been rational under the circumstances").

    Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

1  unnecessary." <u>Strickland</u>, 466 U.S. at 691.  Counsel's "duty to

2  investigate," however, is not "limitless" and does not

3  "necessarily require that every conceivable witness be

4  interviewed" or "every path" pursued.  <u>Hamilton v. Ayers</u>, 583

5  F.3d 1100, 1129 (9th Cir. 2009) (citation omitted).  Further,

6  "when a defendant has given counsel reason to believe that

7  pursuing certain investigations would be fruitless or even

8  harmful, counsel's failure to pursue those investigations may not

9  later be challenged as unreasonable." <u>Strickland</u>, 466 U.S. at

10  691.

11       To find prejudice from counsel's failure to investigate, the

12  reviewing court must consider "whether the noninvestigated

13  evidence was powerful enough to establish a probability that a

14  reasonable attorney would decide to present it and a probability

15  that such presentation might undermine the jury verdict." <u>Mickey

16  v. Ayers</u>, 606 F.3d 1223, 1236-37 (9th Cir. 2010).  In doing so,

17  the reviewing court must consider the overall strength of the

18  government's case.  <u>Rhoades v. Henry</u>, 638 F.3d 1027, 1049-50 (9th

19  Cir. 2011) (as amended).

20       C.   <u>Analysis</u>[17]

21       Petitioner is not entitled to habeas relief on his

22  <u>Strickland</u> claim even under a <u>de novo</u> standard of review.

23       As an initial matter, because Petitioner never submitted a

24

25       [17] A guilty plea generally bars federal habeas relief for

26  any alleged preplea constitutional violations.  <u>See</u> <u>Tollett v.</u>
   <u>Henderson</u>, 411 U.S. 258, 267 (1973).  Because Respondent

27  expressly notes that Petitioner's claims, as construed, "do not
   appear to be barred" under <u>Tollett</u> (Answer at 8 n.4), the Court

28  takes Respondent at his word.

declaration from trial counsel regarding his reasons for not
conducting further investigation or retaining a video expert,
there was no basis for finding that counsel performed
deficiently.  See Gentry v. Sinclair, 705 F.3d 884, 899-900 (9th
Cir. 2012) (as amended Jan. 15, 2013).

In any event, Petitioner's claim fails.  The evidence in the
Tran incident virtually assured conviction because, among other
things, police observed Petitioner driving away from Tran's home
at a high speed and saw him throw numerous incriminating objects
out of his car during the chase, including a black ski mask.
(See, e.g., Lodged Doc. 1, Clerk's Tr. at 47-48.)  Police found
numerous items, including a black gun bag and a number of luxury
purses, inside the car.  (See id. at 49-51.)  When he was
arrested, Petitioner was carrying denominations of cash similar
to those the robber had taken from Tran.  (See id. at 26, 50-51.)
Finally, DNA testing on the black ski mask found along the
getaway route showed that it had undoubtedly been worn by
Petitioner.  (See id. at 62-73.)  Petitioner sets forth no
theories about how his defense counsel could have conceivably
challenged the Tran charges, and this Court can think of none
either.

Arguably, however, because neither Guerrero nor Tran could
identify Petitioner and the video expert opined that the person
in the black-and-white surveillance video may have been white, a
conviction on the Guerrero burglary charge was less certain.  But
any such argument ignores that the incidents were linked by
strong circumstantial evidence.  The Guerrero burglary occurred
near midnight at a private home in San Gabriel; the Tran crimes

1  occurred just more than an hour later, also at a private home in

2  San Gabriel.  Guerrero and Tran both testified that a man with a

3  big build, wearing a black ski mask and a white shirt or

4  sweatshirt, was the perpetrator.  One of the officers testified

5  that Petitioner threw a white shirt and numerous objects from his

6  car during the chase and positively identified Petitioner as the

7  driver.  (See Lodged Doc. 1, Clerk's Tr. at 48-49.)  Based on all

8  the evidence, it could reasonably be inferred that Petitioner was

9  a gun-toting burglar who had committed numerous burglaries,

10  including those of Tran's and Guerrero's houses.

11      Further, based on the trial court's conclusion that the

12  video did not exonerate Petitioner because he was light skinned

13  and had a build similar to the suspect in the video, a jury could

14  reasonably have decided that the person depicted in the video was

15  Petitioner notwithstanding what any video expert might have

16  opined.[18]  Indeed, testimony from a video expert on the issue of

17  identification might not even have been allowed, given that

18  identifying a perpetrator in a video would appear to be well

19  within the capacity of jurors.  See, e.g., United States v.

20  Labansat, 94 F.3d 527, 530 (9th Cir. 1996) (defendant not

21  prejudiced by counsel's failure to call identification expert at

22  trial in part because jury viewed surveillance photographs

23  itself); People v. Cole, 47 Cal. 2d 99, 103 (1956) ("[D]ecisive

24  consideration in determining the admissibility of expert opinion

25

26      [18] Indeed, when asked by defense counsel at the preliminary

27  hearing whether Petitioner was African-American, the state DNA
   expert answered, "I have no idea."  (Lodged Doc. 1, Clerk's Tr.

28  at 73.)

56

evidence is whether the subject of inquiry is one of such common
knowledge that men of ordinary education could reach a conclusion
as intelligently as the [expert] witness[.]").

Petitioner also overlooks that his counsel viewed the
surveillance videos at the preliminary hearing and saw for
himself what they depicted.  Counsel was also aware that based on
those videos and the other evidence, the judge at the preliminary
hearing had found probable cause to hold Petitioner to answer the
charges.  In light of all these considerations, trial counsel
could have made a strategic decision not to retain a video
expert.

Likewise, Petitioner's challenge to the import of the DNA
evidence fails.  Petitioner does not explain how the presence of
DNA from a minority profile on the ski mask would have exonerated
him or even been exculpatory.  The eyewitness testimony that
Petitioner himself had thrown the ski mask from his car during
the pursuit was virtually unassailable, as was the DNA evidence
showing that regardless of who else might have done so,
Petitioner had also worn the mask.  Consequently, the video
expert's finding that a light-skinned man was possibly involved
in the Guerrero burglary would have had negligible impact on a
jury's analysis of the DNA evidence from the ski mask.

In light of these factors, Petitioner's counsel could have
made a reasonable strategic decision to forgo further
investigation into the videos and reasonably counseled Petitioner
to take the plea.  Accordingly, Petitioner's counsel's
performance was not deficient.  See, e.g., Richter, 562 U.S. at
106-10 (counsel's performance not deficient for failing to hire

expert when it was uncertain if expert's testimony would have been beneficial); <u>Mickey</u>, 606 F.3d at 1246 (counsel's performance not deficient for failing to call experts when it was questionable whether admission of experts' testimony would have been allowed by trial judge and experts' opinions would have been subject to challenge on cross-examination).

Further, Petitioner has not shown that he suffered any prejudice — that is, that he would have gone to trial rather than plead no contest if counsel had retained a video expert and called the DNA evidence into question.   In light of all the evidence, the jury could reasonably have convicted on all charges even if a video expert had testified that the person in the Guerrero video looked white.   Accordingly, because the Court is not convinced that Petitioner would have stood trial if his counsel had performed differently — much less that he would have been acquitted — Petitioner cannot show prejudice.   <u>See, e.g.</u>, <u>Lambert v. Blodgett</u>, 393 F.3d 943, 982 (9th Cir. 2004) ("Courts have generally rejected claims of ineffective assistance premised on a failure to investigate where the record demonstrates that the defendant would have pled guilty despite the additional evidence and where the additional evidence was unlikely to change the outcome at trial." (citing <u>Hill</u>, 474 U.S. at 56)); <u>Langford v. Day</u>, 110 F.3d 1380, 1388 (9th Cir. 1996) (as amended Apr. 14, 1997) (denying ineffective-assistance claim on ground that petitioner would have pleaded guilty anyway even if offered defense expert).

1

**CONCLUSION AND ORDER**

2       IT IS ORDERED that the Petition is denied and Judgment be

3   entered dismissing this action with prejudice.

4

5   DATED: <u>November 30, 2016</u>

6                                          JEAN ROSENBLUTH
                                           U.S. MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28